### THE E. D. HALEY.

#### (District Court, E. D. New York. March 20, 1912.)

Towage (§ 11*)—Injury to Tow—Grounding.

    A tug *held* in fault for the grounding of a loaded ice barge on a bar in Rondout creek, causing her injury by straining, on the ground that the captain should have exercised more care to make sure that there was sufficient water over the bar at that stage of the tide before attempting to cross.

    [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

In Admiralty. Suit by William D. Dittmar, as owner of the barge W. D. Dittmar, against the steam tug E. D. Haley. Decree for libelant.

James J. Macklin, for libelant.
Hyland & Zabriskie, for claimant.

CHATFIELD, District Judge (orally at close of case). On May 28, 1911, at a little after 2 p. m., the tug E. D. Haley took in tow the barge W. D. Dittmar, near the icehouse in Rondout creek, and expected to place her in a tow in the Hudson. The barge, which drew some 11 feet or more, was heavily loaded and was taken out on the first of the ebb, under such condition of tide that the captain expected

to be able to get down the creek and land the boat in the tow upon that trip. He must have observed sufficient as to the condition of the tide to know, however, that there was a possibility of failure. He took no measurements, used no caution, and found no difficulty in proceeding at ordinary speed until the boat arrived at a mud flat or bar, where it became fast in the mud. Although he hooked up his engine and succeeded in dragging her 100 feet or so further, he was unable to pull her over the bar, with the tide constantly falling. The time at which it became low tide, and at which the boat floated again, when the tide came in, would indicate that either the tide in the afternoon was so low that an additional obligation was placed upon the master because of that fact, or else that he did not start as near high tide as he says.

Now, as to the situation of the boat upon this bar, there is not a great amount of contradiction. The captain places the tug upon his port side, while the captain of the barge states that the tug was on the starboard. But they both agree as to the general situation of the barge in the river, and they both agree that, as the boat lay there, she was lower at one corner to some extent. The captain of the barge recollects that at low tide, which would be in the neighborhood of dusk, he could see the bar and measure the shallow water on his port side.

It is agreed that the bank upon the starboard side of the creek or the mud flat on the starboard side of the creek would have been out of water at that time, and that he could have seen that. The captain of the barge says that his port after corner was tilted down, and the forward starboard corner, and in fact the whole starboard side, tilted down more or less. He testifies that he found three feet of water around the stern and seven feet at the bow, and about seven feet along the starboard side at low water. But those details, in so far as they are contradicted by the captain of the tug, do not seem to affect the situation to any great extent. For if the vessel rested upon a rock or other object which could have caused the gouge in the bottom, the boat would have been tilted as the captain of the tug says, rather than as the captain of the barge places her. But in that case she would have been hung on this rock, instead of being aground at the stern.

The testimony as to the amount of leakage, or that no pumping occurred, is not particularly persuasive, because the witnesses for the tug testify that these ice barges have to be pumped twice a day, and they were not with the barge long enough to have their attention attracted by the pumping, unless it had been longer continued than they had a chance to observe.

I think one of the most significant things is that no attention was called to the leakage, nor to any question of damage, either when the tug took the barge in tow, or when they put her in the tow, or when she got to Weehawken, and the testimony that the barge was aground at Weehawken, and again at Brooklyn, would explain why the leakage increased, and might explain some of the condition in which the boat was, for there is testimony that she had to be pumped out when in Brooklyn, and if she had to be pumped out she must have leaked.

If she had not been leaking before when she had carried other cargoes, this leakage naturally resulted from something that occurred

during the period that we have heard about in this case. I think that on that phase of the case it would appear that some strain resulted from the grounding upon the mud flat, and that it was a strain that might have been expected by the captain of the tug. It was his duty, either to see that the tide was sufficient to take the boat over, or that he did not get caught in the shape that he did. I think that the tug was negligent in the way that they assumed that nobody could be hurt on the Rondout bar; but as to the extent of the injuries, and what the injuries were, I think there is considerable question.

As to the survey, it is evident that Mr. Wiedener went there with the idea of seeing no injuries, and that what caulking he found to be necessary, he assumed had been necessary all the time. I think the testimony shows that the strain had increased the necessity for repair just at that time. On the other hand, I do not think that either Mr. Crane or Mr. Long were justified in assuming that all of the injuries came from the particular cause to which they assigned them. The scar upon the bottom was not of sufficient seriousness to make them immediately repair the boat. A gouge 10 inches wide and 1½ inches deep, extending over eight or ten planks, even if it did not break the plank in some respect, would certainly have made such an injury that it could not be taken by Mr. Wiedener for a scratch, nor could he have estimated it as a quarter of an inch deep, running out to nothing at the end. There was probably exaggeration by each faction of the surveying party; but I do not think that the injury has been shown to have been such that the estimated cost of replacing the injured planks can be taken as evidence of the extent of the strain suffered in the mud.

Now, the items of accounting have been very carefully put in here, so that a reference may not be necessary in this case. This, perhaps, took some time; but it throws much light on the claim for damages in the same way that the scar throws light upon the injury. It is evident that of the items charged, but $86.71 had to do with the strain and the caulking of the seams. Hence the libelant has sustained the burden of proof, which is on him to prove his case only to the extent of showing that there was some strain and some grounding, and that the amount of caulking that was done in order to put the boat in usable condition is all that he has shown any reason to suppose followed from that strain.

It might be suspected that if this boat were dragged over a bar a distance of over 100 feet, in waters as far north as Athens or Rondout, N. Y., entirely away from harbor mud, an obstruction might have been encountered in that 100 feet that would have caused the scar in question; but there is nothing to show that the boat brought up at the point of striking. She might have struck something and have suffered this scar just before going fast aground, and the seams might have been strained, so that when she grounded upon the flat they opened. But the scar might also have been older than this, and the strain therefrom have already occurred. The burden of proof has not been met to the extent of showing that the boat suffered any injury to her bottom where the scar was found, with the probably resultant condition of her seams when grounding on the mud on the day in question.

But it has been shown that some strain was caused by the grounding and some damage done, and for that the libelant may recover. The materials used and work done in repairing the deck and rail should not be included. This represented about 20 per cent., when computed on the basis of the items plainly relating to the deck and upper works alone, and libelant may recover to the extent of $12 dockage and $64.71 repairs, thus taking off $10 for the amount of labor that was put on the deck and the rail, if the parties agree to enter a decree for that amount without a reference. If not, the libelant may have a decree for the amount that he can prove for the dockage, labor, and materials used on the bottom and side seams alone. But no costs of the reference will be granted, unless the amount allowed justifies the refusal to take a decree as indicated above.

The libelant may have costs of the action aside from the reference.